**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 15 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ABRAHAM BARRAGAN, also known as "Abran", also known as "El General",

Defendant - Appellant.

No. 03-1480
(D. Ct. No. 02-CR-290-B)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Circuit Judge, **McKAY**, and **EBEL**, Circuit Judges.

Plaintiff-Appellant Abraham Barragan pleaded guilty to possession with intent to distribute five kilograms or more of cocaine and to aiding and abetting in that offense. The District Court sentenced him to 120 months' imprisonment. Mr. Barragan contends that the District Court erred in refusing to apply the so-called "safety valve" provision of 18 U.S.C. § 3553(f) and United States

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Sentencing Guidelines § 5C1.2(a),[1] which would have allowed him to be sentenced beneath the otherwise applicable 120-month mandatory minimum for his offense. The District Court determined that the "safety valve" did not apply because Mr. Barragan failed to satisfy the statutory requirement that he "truthfully provide[ ] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5). We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM. [2]

## I. BACKGROUND

Mr. Barragan is a native of Mexico but has enjoyed legal resident status in the United States for many years. For about the last five years, he has been employed as a seasonal worker at Echter's Gardens in Arvada, Colorado. Jose Mendez, a paid informant for the Denver Police Department ("DPD"), also worked at Echter's Gardens during this time.

Sometime in 2001 or early 2002, Mr. Mendez asked Mr. Barragan if he could help to arrange the transport of drugs to Mr. Mendez's "boss," Detective

---

[1]18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2(a) provide identical requirements. To avoid confusion, we refer only to § 3553(f) for the remainder of this opinion.

[2]Because Mr. Barragan does not assert that the District Court erred under *United States v. Booker*, — S.Ct. —, 2005 WL 50108 (2005), we need not consider its application to his appeal.

Jose Garcia of the DPD, after which Mr. Barragan would be paid $2,000. Mr. Barragan ultimately agreed and gave Mr. Mendez the business card of a man Mr. Barragan believed might be involved in the drug trade named Alfredo Pando. Mr. Pando apparently resides in Juarez, Mexico. Thereafter, Mr. Mendez introduced Mr. Barragan to Detective Garcia, who was posing as an undercover agent. Mr. Barragan and Detective Garcia discussed prices and quantities for a potential cocaine transaction. On April 1, 2002, they agreed that Mr. Barragan would provide Detective Garcia with eight kilograms of cocaine for $144,000.

On April 14, nearly eight kilograms of cocaine arrived in Denver hidden in a Ford Explorer driven by Jaime Cervantes. Mr. Cervantes phoned Mr. Barragan upon arriving in Denver, and the two men met each other downtown. Mr. Barragan then led Mr. Cervantes to the motel where Mr. Barragan was living; and shortly thereafter, Mr. Mendez arrived. Mr. Barragan called Detective Garcia to tell him that he had the cocaine. The men left the motel to deliver the cocaine to Detective Garcia, with Mr. Barragan riding in Mr. Mendez's car and the Explorer following. Police officers acting at Detective Garcia's direction stopped the Explorer and found nearly eight kilograms of cocaine hidden behind the vehicle's two front quarter panels.

The Government indicted Mr. Barragan on three separate counts relating to these events. In exchange for the Government's promise to move to dismiss the

other two counts, Mr. Barragan pleaded guilty to one count of possession with intent to distribute five kilograms or more of cocaine under 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii) and aiding and abetting in that offense under 18 U.S.C. § 2(a). The agreement also contained a stipulation of facts relevant to the offense and to sentencing. Mr. Barragan signed the agreement and acknowledged those facts to be true. Moreover, the plea agreement expressly provided that if Mr. Barragan met all the requirements for "safety valve" consideration pursuant to 18 U.S.C. § 3553(f), the Government would recommend that the sentencing court impose a sentence in accordance within the applicable guidelines range of 87–108 months without regard to the statutory minimum sentence of 120 months. At the sentencing hearing, however, the District Court found that Mr. Barragan was not being fully truthful about his participation in the offense; as such, it determined he was not eligible for application of the safety valve provision and sentenced him to 120 months' imprisonment.

On appeal, Mr. Barragan makes two arguments. First, he contends that the District Court committed legal error because it failed to consider the plea agreement's stipulated facts in determining whether he qualified for the safety valve provision. Second, he contends that the District Court committed clear error in finding that he did not provide the Government with all information and evidence he had concerning the offense. We address each argument in turn.

- 4 -

## II. DISCUSSION

A.  <u>The District Court Considered the Stipulated Facts in the Plea Agreement</u>

The "safety valve" provision under 18 U.S.C. § 3553(f)(1)–(5) directs district courts to sentence offenders in accordance with the applicable guidelines without regard to the statutory minimum sentence if five eligibility criteria are met.  It is undisputed that Mr. Barragan meets the first four criteria; we only consider the fifth.  Section 3553(f)(5) states that an offender is entitled to the safety valve provision if:

> [N]ot later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

Mr. Barragan contends that by its terms, § 3553(f)(5) requires district courts to take into account a defendant's sworn acknowledgment of facts in a plea agreement in determining whether he provided the Government with all information about the offense.  Mr. Barragan argues that the District Court failed to do so and that this failure constitutes legal error.

Mr. Barragan, however, did not raise this issue before the District Court.  In his objections to the presentence report, he only argued that he was a minor player and had no more information to divulge—not that his statements in the plea

agreement were being slighted. Mr. Barragan reiterated those arguments during the sentencing hearing, never complaining that the District Court had overlooked the stipulation of facts in the plea agreement. Therefore, because Mr. Barragan raises this issue for the first time on appeal, we review for plain error. Fed. R. Crim. P. 52(b). To notice plain error under Rule 52(b), defendant must show that: (1) there was error; (2) the error was "plain" or "obvious;" (3) the error affected his substantial rights; and (4) the error seriously affected that fairness, integrity, or public reputation of judicial proceedings. *United States v. Gonzalez-Edeza*, 359 F.3d 1246, 1250 (10th Cir. 2004).

Mr. Barragan does not satisfy the first prong of plain error review. Assuming that the District Court must consider facts contained in Mr. Barragan's plea agreement, it is clear from the record that the District Court did so in this case. At the conclusion of testimony on behalf of both Mr. Barragan and the Government, the District Court found that Mr. Barragan's testimony "runs contrary to the skeletal outline of the agreed stipulation of factual basis set forth in the Plea Agreement, a factual recitation which Mr. Barragan acknowledged under oath to be true." The District Court also specifically referred to the plea agreement to discuss the communications that took place between Detective Garcia and Mr. Barragan. Mr. Barragan's argument that the District Court ignored the plea agreement is simply without merit.

B.     The District Court's Factual Findings Are Not Clearly Erroneous

Mr. Barragan next argues that the District Court erred in finding that he had not truthfully provided the Government with all information about the offense. Mr. Barragan has the burden of proving, by a preponderance of the evidence, the applicability of the "safety valve." *United States v. Verners*, 103 F.3d 108, 110 (10th Cir. 1996). "In order to assess whether a defendant has satisfied subsection 5, a court must determine the quality and completeness of all information furnished to the government by Defendant." *United States v. Gama-Bastidas*, 142 F.3d 1233, 1242 (10th Cir. 1998). Whether that information is truthful and complete requires a factual finding by the district court. *Id.* at 1243.

A district court's factual findings are reviewed for clear error. *United States v. Garcia*, 182 F.3d 1165, 1175 (10th Cir. 1999). On clear error review, we may reverse "only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." *United States v. Cernobyl*, 255 F.3d 1215, 1221 (10th Cir. 2001) (internal quotation omitted). This standard, however, "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). "In applying the clearly erroneous standard . . . appellate courts must constantly have in mind that their function is

not to decide factual issues *de novo*." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969).

Here, Mr. Barragan stipulated to the following facts in the plea agreement: On April 1, Mr. Barragan negotiated with Detective Garcia for the purchase of eight kilograms of cocaine for $144,000. On April 13, Mr. Barragan called Detective Garcia and told him the cocaine was on its way. On April 14, law enforcement officers saw Mr. Barragan meet with Mr. Cervantes in downtown Denver. After the meeting, Mr. Cervantes got into an Explorer and followed Mr. Barragan back to the motel where he was staying. Upon returning to the motel, Mr. Barragan called Detective Garcia and told him that he wanted to bring the cocaine to his residence. En route, the Explorer was stopped and searched, and Mr. Barragan and Mr. Cervantes were arrested.

The Government supplemented this version of events during Mr. Barragan's sentencing hearing. According to the testimony of Detective Garcia, Mr. Mendez is a reliable informant who told him that a man named Abraham knew parties in Mexico and could arrange for a delivery of cocaine. Detective Garcia also testified that he and Mr. Barragan spoke on numerous occasions about the amount of cocaine to be obtained, its price, and to which city it would be delivered. Mr. Cervantes testified that Mr. Pando asked him to bring a load of cocaine to Denver to a man Mr. Pando had previously dealt with named "The

General," and that Mr. Barragan identified himself over the phone using this name. Testimony also revealed that Mr. Cervantes gave investigators a phone number he claimed belonged to Mr. Pando. Several calls were made from that number to Mr. Barragan in the few weeks and days leading up to the delivery of cocaine to Denver.

Mr. Barragan testified, however, that he had never bought or sold drugs before, that he had only met Mr. Pando once, and that he did not know whether Mr. Pando was a drug dealer. Mr. Barragan also insisted that Mr. Mendez, not he, had set up the deal with Mr. Pando. Testimony also showed that the phone number Mr. Cervantes claimed was Mr. Pando's was registered under a different name. Furthermore, Mr. Barragan claimed he had never heard anyone refer to him as "The General." Mr. Barragan's niece also testified that her uncle is unsophisticated and lacks leadership skills, implying that he is incapable of structuring drug deals. Finally, Mr. Barragan stated that he has memory problems due to a head injury and three heart attacks; thus, counsel for Mr. Barragan stated that he "has a great deal of confusion in trying to remember these events."

The District Court found the Government's version of events to be more believable, finding "the truth of the matter" to be that Mr. Barragan structured and arranged the drug deal from a source in Juarez, that this source entrusted Mr. Barragan with eight kilograms of cocaine, and that Mr. Barragan was known to

his source as "The General" and identified himself that way to Mr. Cervantes. This finding was based on the court's belief that "[i]t defies credibility to believe that the . . . Juarez source would simply transport eight kilograms of cocaine to an unknown, untested individual simply identified over the telephone as a Mr. Mendez and trust that individual to return $144,000 to that source for that cocaine." As such, the District Court found "that Mr. Barragan has not been completely truthful, has not provided full candor, and has, I infer, for whatever reason, other information and knowledge which he declines to relate to the government. He's simply not eligible for the application of the safety valve provision."

Mr. Barragan maintains that the District Court did not give sufficient weight to the possibility that Mr. Mendez, as a professional informant well-versed in drug trafficking knowledge, could have structured a $144,000 drug transaction with a person who has never met him; to Mr. Barragan's intelligence level; to the fact that Mr. Mendez did not live the flashy lifestyle associated with drug dealers; to the fact that Mr. Cervantes was the only person to testify that Mr. Barragan introduced himself as "The General"; to Mr. Cervantes' testimony that he knew another man named "The General" in Kansas City; to the fact that Mr. Cervantes had lied in a previous conversation with investigators; and to the motive of Mr. Mendez, a paid informant, to make the deal happen while making Mr. Barragan

appear responsible.

Nonetheless, there is ample support in the record for the District Court's finding. *See Cernobyl*, 255 F.3d at 1221. Moreover, after a review of the record, we are not left with the definite and firm conviction that a mistake has been committed. *See id.* The District Court's finding, therefore, is not clearly erroneous.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the sentence imposed by the District Court.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Chief Circuit Judge